**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| James Costello Turpen, | ) | Case No. 25-12572-MER |
| | ) | Chapter 7 |
| Debtor(s). | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | |
| CHP 1010 MCDOWELL LLC; CHP | ) | |
| EDWARDS MEDICAL LLC; CHP | ) | |
| METRO NORTH LLC; CHP | ) | |
| SCOTTSDALE MEDICAL PAVILION | ) | |
| LLC. | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Adv. No. 25 - _____ MER |
| | ) | |
| James Costello Turpen, | ) | |
| | ) | |
| Defendant. | ) | |

---

**COMPLAINT**

---

Plaintiff(s) CHP 1010 McDowell LLC, CHP Edwards Medical LLC, CHP Metro North LLC, CHP Scottsdale Medical Pavilion LLC, hereby object to the dischargeability of the obligation owed to them pursuant to 11 U.S.C. §523(a) and state and alleges as follows:

**<u>JURISDICTION AND VENUE</u>**

1.      The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

2.      This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

3.      Venue in this district is proper under 28 U.S.C. § 1409(a).

4.      This adversary proceeding is commenced pursuant to Rule 7001(c) of the Federal Rules of Bankruptcy Procedure.

5.     Plaintiffs consent to the entry of final orders and judgment by the Bankruptcy Court.

## PARTIES

6.     CHP 1010 McDowell LLC ("**CHP McDowell**"), is a limited liability company with the primary business address of 3101 Iris Ave, Ste 240, Boulder, Colorado.  CHP McDowell was formed to acquire, remodel, lease, manage, and eventually sell an approximately 62,000 square-foot medical office property located at 1010 McDowell Road, Phoenix, Arizona.  CHP McDowell was formed on or about September 2015.

7.     CHP Metro North LLC ("**CHP Metro**"), is a limited liability company with the primary business address of 3101 Iris Ave, Ste 240, Boulder, Colorado.  CHP Metro, was formed to acquire, remodel, lease, manage, and eventually sell an approximately 91,000 square foot medical office property located at 11990 Grant Street, Northglenn, Colorado.  CHP Metro was formed on or about October 2017.

8.     CHP Edwards Medical LLC ("**CHP Edwards**"), is a limited liability company with the primary business address of 3101 Iris Ave, Ste 240, Boulder, Colorado.  CHP Edwards was formed to acquire, remodel, lease, manage, and eventually sell an approximately 167,000 square foot medical office building located at 1300 N 12th Street in Phoenix, Arizona adjacent to Banner University Hospital in Phoenix, Arizona.   CHP Edwards was formed on or about December 2017.

9.     CHP Scottsdale Medical Pavilion, LLC ("**CHP Scottsdale**"), is a limited liability company with the primary business address of 3101 Iris Ave, Ste 240, Boulder, Colorado.  CHP Scottsdale was formed to acquire, redevelop, lease, manage, and eventually sell an approximately 50,000 square foot medical office building located at 7331 E Osborne Road in Scottsdale, Arizona. CHP Scottsdale was formed on or about January 2020.

10.     Collectively CHP Metro, CHP McDowell, CHP Edwards, CHP Scottsdale, are referred to as "**CHP Entities**" or "**Plaintiffs**".

11.     Defendant, James C. Turpen ("**Debtor**" or "**Defendant**") is the debtor in the above captioned underlying bankruptcy matter and is a natural person who at the time of filing was residing at 501 S. Cherry St., Ste 1100, Denver, CO 80246.

## GENERAL ALLEGATIONS

12.     Defendant was a long-time business associate of Plaintiffs principals, W. Scott Reichenberg ("**Mr. Reichenberg**") and Neil Littmann ("**Mr. Littmann**"), having first worked with them in 2002 as a property manager of their first medical real estate investment.

13.     Defendant had at that time extensive experience in property management, which had long been the focus of his family's business.

14.     Over time, Debtor expanded his competencies and developed construction and development expertise and formed a fully integrated real estate platform encompassing general contracting, leasing, tenant improvements, and property management.

15.     When Mr. Reichenberg and Mr. Littmann were prepared to invest in their next portfolio of medical office buildings, they entered into an arrangement with Debtor to leverage his management and development expertise and acquired their first joint property as co-syndicators.

16.     In furtherance of this arrangement, Debtor owned and controlled Centum Construction, Inc., an entity primarily engaged in providing general construction services, including building, renovation, and related contracting work.

17.     Debtor also owned and controlled Centum Health Properties, Inc., an entity whose primary purpose was to provide property management and leasing services for commercial real estate assets. Collectively, Centum Construction, Inc. and Centum Health Properties, Inc. are referred to herein as the "**Centum Entities.**"

18.     All of the actions contained herein were made by the Debtor either individually or by Centum Entities, or other unknown entities at the direction and control of the Debtor.

19.     Over the course of their 20-year business relationship, Plaintiffs and Debtor developed a strong foundation of mutual trust. During this time, their arrangement functioned effectively, and they successfully completed numerous real estate projects together without known incident.

20.     Mr. Reichenberg, Mr. Littmann and their investors invested in their latest batch of medical office buildings and formed the CHP Entities between 2015 - 2020.  Consistent with the prior operations, Debtor served as the "boots on the ground," (i.e. property management and leasing) while the CHP Entities provided the necessary capital, lending relationships and co-asset management.

21.     As is customary in the industry, the Centum Entities were granted access to the CHP Entities' bank and financial accounts in their capacity as property manager. Additionally, Debtor maintained a partial managerial and ownership interest in the CHP Entities (via other entities owned by the Debtor), which further authorized his individual access to those accounts.

22.     During this same time period (approximately 2022-2024), Debtor began planning a private real estate investment trust ("**REIT**") with the goal of raising $30 million to $50 million in capital and ultimately taking the REIT public with a projected valuation of $115 million to $125 million of initial value.  This was in addition to his responsibilities to the CHP Entities.

23.     Once the initial funding was secured, Debtor intended to continue raising equity with the goal of acquiring additional properties and ultimately reaching a portfolio valuation of approximately $1 billion.

24.     Among other things, Plaintiffs were under the understanding that in order to procure the necessary funding, Debtor was required to create a REIT qualified entity, draft governing documents, appoint a board of Trustees, engage counsel to ensure compliance with IRS and SEC laws and generally hire an executive team to handle the aforementioned as well as secure seed funding to build an investment platform.

25.     Debtor invited Mr. Reichenberg and Mr. Littmann to participate in the venture, but they declined, citing both the lack of committed funding of that size and their desire to scale back professionally as they approached retirement.  Although they did signal and agree to sell the CHP properties to the REIT at a negotiated arms-length market valuation as a way to help seed Debtor's project.

26.     Ultimately, however, Debtor was unable to raise more than a few million dollars due to a lack of interest from the equity markets. As a result, Debtor reduced the initial fundraising target by half and focused on acquiring two buildings he had placed under contract in Kentucky and Arizona, which were unrelated to the CHP Entities.

27.     The Centum Entities and the REIT entities shared employees, many of whom were tasked with responsibilities across both platforms. Mr. Reichenberg and Mr. Littmann regularly engaged with members of the REIT's executive team, who, in addition to their REIT-related duties, were also actively involved in overseeing and managing the operations of the Centum Entities. This arrangement was acceptable to Mr. Reichenberg and Mr. Littmann, provided the REIT responsibilities did not interfere with the employees' ability to effectively support the CHP Entities.

28.     To facilitate the funding and administration of activities related to the construction, management, and operation of properties owned by the CHP Entities, Debtor, through the Centum Entities, procured a license for accounting software known as Yardi.

29.     Yardi is a comprehensive property management and accounting software platform used to manage virtually all components of real estate operations, automate financial workflows, and enforce internal controls across multi-entity portfolios.

30.     Here, Yardi was the designated system through which funding requests, invoice approvals, and disbursements were processed. Centum Health Properties contracted for this software and Centum Entities were in control of said software.  As is customary in the industry for property management companies, the Centum Entities via Debtor had sole administrative control over Yardi to assign permissions and authority.  CHP Entities had no access or optics into the software except for the reports Centum Entities provided to the CHP Entities.

31.     Debtor designated himself as the system administrator within the Yardi platform, which was implemented to facilitate accounting and payment processes for the CHP Entities.  At the time of onboarding it was agreed, consistent with industry standards, that the Yardi system would operate under a dual control structure.

32.    Under this framework, any payment request involving the Centum Entities required the joint oversight of the Debtor (as owner of the Centum Entities) and his operational team, typically the CFO or COO.

33.    In addition, a clear policy was established that no payment to any Centum Entity would be processed without prior approval from either Mr. Littmann or Mr. Reichenberg, acting in their roles as co-managers of the CHP Entities.  Debtor not only participated in the implementation of these internal controls but was instrumental in their initial configuration. Debtor had knowledge of, and agreement with, the safeguards that he later intentionally bypassed.

34.    When the Centum Entities required funding from the CHP Entities, a request would be generated through the Yardi system. Mr. Littmann would receive a notification and either approve, deny or respond with clarifying questions or a request for additional supporting documentation. Upon approval, Yardi would flag the transaction accordingly and include it in a weekly batch of approved payments. A designated individual would then manually review and reconcile the bank account against the approved Yardi transactions.

35.    In the middle of 2023, Debtor began submitting invoices for questionable reimbursements that the principals declined to approve, as they either did not comply with their employment agreement, established policy, or industry standards or required additional backup / discussion before being processed. While many routine and customary requests continued to be submitted and approved during this period, the principals nonetheless withheld approval for certain transactions and consistently requested follow-up meetings and supporting documentation from the Debtor. Debtor repeatedly postponed these meetings or ignored the requests, leading the principals to believe that the unapproved invoices were not being paid.

36.    In reality, the Debtor began engaging in a scheme of fraudulent and larcenous activity to pay the unpaid invoices and began withdrawing money, bypassing Yardi, directly from the CHP Entities' bank accounts.  In some instances, Debtor wrongly used his access to the CHP Entities' lines of credit and went so far as to draw funds directly from these loans directly into the Centum Entities accounts.  This is despite the operating agreements of the CHP Entities requiring the approval of two out of the three managers to take any material action on behalf of the CHP Entities.

37.    As was later discovered but unknown at the time, Debtor used his exclusive administrative control over the Yardi system to remove or bypass Mr. Littmann and Mr. Reichenberg from the approval process, enabling requests to be approved without their knowledge or consent.  The subsequent absence of routine approval requests for ordinary and customary expenses, coupled with Debtor's continued lack of communication, ultimately prompted an internal review of the books and records.

38.    Mr. Littmann and Mr. Reichenberg began to discover these irregularities, discrepancies, unauthorized approvals, and falsified approval records.

39.    When Mr. Littmann and Mr. Reichenberg were unable to reach Debtor to address

their concerns, they began directing questions to the executive team of the Centum Entities, individuals with whom they had established relationships based on their knowledge of, and responsibilities for, the management of the CHP Entities' properties.

40. They learned from the Centum Entities' employees/executive team that there was a lot of money moving around which only served to heighten their suspicions. The Centum employees/executive team began investigating and attempted to reconcile the transfers and realized something was amiss and sought answers internally from the Debtor.

41. In response, Debtor directed his employees to cease communications with Mr. Reichenberg and Mr. Littmann. The Centum Entities' CFO then resigned or was terminated and a new CFO assumed those responsibilities whose employment was also voluntarily or involuntarily terminated after discovering the irregularities.

42. Recognizing that the safeguard of having multiple individuals review financial transactions, which significantly reduces the likelihood of coordinated fraud, was now gone, Mr. Littmann and Mr. Reichenberg closed the bank accounts of the CHP Entities, transferred the funds to sister accounts with dual controls, and initiated a preliminary forensic audit.

43. That preliminary audit revealed approximately $3 million to $7 million in transactions that could not be accounted for.

44. The preliminary audit found, in addition to approving payments without the consent of Mr. Littmann or Mr. Reichenberg, the Debtor used his access to the CHP Entities' bank accounts to transfer funds directly to the Centum Entities, bypassing the Yardi approval process entirely. On numerous occasions, Debtor submitted invoices for subcontractor work, received payment, but failed to pay the subcontractors. As a result, liens were either filed or threatened against the properties, and the CHP Entities were forced to pay the subcontractors a second time.

45. In other instances, Debtor transferred funds from the CHP Entities to the Centum Entities without submitting any invoice at all, later asserting that such transfers were "prepayments" for work to be performed. Debtor even directly accessed and drew funds from the CHP Entities' lines of credit, rather than first depositing them into the appropriate partnership bank accounts, and diverted those funds to the Centum Entities thus making it even harder to track.

46. During the course of the preliminary audit investigation, the CHP Entities sought input from the Debtor who then began to engage with Mr. Reichenberg, Mr. Littmann, and the interim auditor. For at least a while, Debtor was generally cooperative throughout the process. He participated in discussions, provided information upon request, and ultimately admitted to certain acts of malfeasance. See **Exhibit A – Letter dated August 1, 2024**, attached and incorporated herein by reference. Eventually, the Debtor resigned from all duties and reduced communications and willingness to continue to explain his actions.

47. Of the $3 million to $7 million of funds at issue, the interim auditor and the Debtor agreed that $1.3 million of transfers were wrongfully made, consisting primarily unauthorized

"prepayments" which the Debtor unilaterally initiated. However, the remaining balance remains unaccounted for.

48. The Debtor maintained that he had records to demonstrate the legitimacy of the remaining balance. Accordingly, Plaintiffs extended to the Debtor 45 days for the opportunity to provide supporting documentation to substantiate the remaining transactions. The Debtor failed to produce any such documentation.

49. After discussions ceased between the Plaintiff and Debtor, the interim auditor determined that an additional $1.5 million in transactions exhibited the same characteristics and patterns as the previously admitted $1.3 million in misappropriated funds, making them relatively straightforward to identify and categorize.

50. The remaining balance, up to approximately $4 million, is significantly more difficult to trace due to the complexity, varying size of the transactions, number of transactions, and lack of appropriate back-up documentation. As this was only an interim audit, the focus was placed on addressing the most accessible and clearly identifiable transactions first.

51. The CHP Entities have since formalized the audit process and engaged a professional accounting and audit firm to supplement the interim audit findings and continue the investigation.

## FIRST CAUSE OF ACTION
(11 U.S.C. §523(a)(2)(A) – False Pretenses)

52. Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

53. The series of events referenced herein, when considered collectively, created a contrived and misleading understanding of the transactions which the CHP Entities were wrongfully induced to extend money or property to the debtor.

54. Due to the false pretenses engaged in by the Debtor, including but not limited to submitting invoices for work which had not yet been performed and invoicing for sub-contractors which were never actually paid, the CHP Entities have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
(11 U.S.C. §523(a)(2)(A) – Actual Fraud)

55. Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

56. The Debtor intentionally engaged in a scheme to deprive and cheat the CHP Entities their property.

57.     Debtor's deceptive acts and trickery, including, but not limited to, intentionally bypassing Yardi's internal controls, directly transferring funds from the CHP Entities' bank accounts, drawing funds from the CHP Entities' loan accounts, submitting false invoices for work not performed, and submitting invoices for subcontractors whom he then failed to pay, have caused substantial financial harm to the CHP Entities, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(11 U.S.C. §523(a)(2)(A) – False Representation)

58.     Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

59.     The Debtor made or caused to be made false representations to the CHP Entities when he submitted invoices for payment work that had not yet been performed and submitted invoices for payment to sub-contractors who he did not pay.

60.     The representations were made with the intent to deceive the CHP Entities into paying the invoices.

61.     The CHP Entities' reliance on the invoices which led to payment was justifiable given the relationship of trust based on the past dealings which existed between the parties and the internal controls which were built in, but bypassed by the Debtor.

62.     The false representations have resulted in damages to the CHP Entities in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
(11 U.S.C. §523(a)(4) – Embezzlement)

63.     Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

64.     The Debtor was lawfully entrusted with the ownership of the CHP Entities bank and other financial accounts when he was made a signatory of such accounts.  The Debtor used and/or consumed those funds for purposes other than for which it was entrusted with fraudulent intent.

65.     The CHP Entities suffered damages due to the Debtor's embezzlement in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
(11 U.S.C. §523(a)(4); C.R.S. §18-4-401 – Larceny)

66.     Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

67.     Debtor intentionally, knowingly, wrongfully, and without authorization, exercised control over property belonging to the CHP Entities including but not limited to funds transferred directly from the CHP Entities' bank accounts without approval, funds dawn from the CHP Entities' lines of credit which were diverted to the Centum Entities, payments made on invoices for services not rendered, payments made for subcontractor services that Defendant failed to remit, funds purportedly "prepaid" for future services which were never authorized.

68.     These acts constitute theft under C.R.S. §18-4-401 as Defendant obtained control over property of another without authorization and with the intent to permanently deprive the owner of its use or benefit.

69.     Pursuant to C.R.S. §18-4-405 any person who commits theft is liable to the rightful owner for three times the amount of the actual damages sustained, along with costs and reasonable attorney fees.

70.     The CHP Entities suffered damages due to the Debtor's theft in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
(11 U.S.C. §523(a)(4); Fraud or Defalcation while Acting in a Fiduciary Capacity)

71.     Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

72.     An express trust existed between the CHP Entities and Debtor who controlled the Centum Entities via the writings in place between the parties, which the Debtor himself signed.

73.     In the alternative a technical trust existed between the CHP Entities and Debtor who controlled the Centum Entities via Colorado law. *Hart v. Colo. Real Estate Com.*, 702 P.2d 763, 765 (Colo. App. 1985) (An agent is one who acts for or in place of another by authority from him.); *See also* CJI-Civ 26:2.

74.     Debtor owed the CHP Entities a fiduciary duty arising from the trust.

75.     Debtor intentionally, knowingly, wrongfully, and without authorization, breached those fiduciary duties when he engaged in conduct including but not limited to funds transferred directly from the CHP Entities' bank accounts without approval, funds dawn from the CHP Entities' lines of credit which were diverted to the Centum Entities, payments made on invoices for services not rendered, payments made for subcontractor services that Defendant failed to remit, funds purportedly "prepaid" for future services which were never authorized.

76.     The Debtor knew, or was willfully blind to and consciously disregarded, a substantial and unjustifiable risk that his conduct would violate his fiduciary duties. Considering the nature and purpose of the Debtor's conduct, as well as the circumstances known to him, his

-9-

actions constituted a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

77.     The CHP Entities suffered damages due to the Debtor's breach of fiduciary duty in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
(11 U.S.C. §523(a)(6) – Willful and Malicious Injury)

78.     Plaintiffs incorporate and re-allege the preceding paragraphs as if set forth fully herein.

79.     The Debtor engaged in a deliberate and intentional injury and acted with the actual intent to cause the financial injury to the CHP Entities when he submitted false invoices for the work not actually performed, submitted false invoices under the pretenses that they were to be paid to sub-contractors and then not actually paid, disabled the accounting controls to pay non-approved invoices, and bypassed the controls put in place and transferred funds to himself for the Centum Entities without permission.

80.     The CHP Entities have suffered damages due to the willful and malicious injuries committed by the Debtor in amount to be proven at trial.

WHEREFORE, Plaintiff respectfully requests this Court, determine that the debt owed by Debtor are nondischargable pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and (a)(6), award Plaintiffs damages in an amount to be proven at trial, award treble damages and attorney fees pursuant to C.R.S. §18-4-405, award Plaintiff's their costs, and for all other and further relief as this Court deems just and proper.

Dated August 11, 2025

Respectfully submitted,

Robertson B. Cohen, 35252
1720 S. Bellaire St; Ste 205
Denver, CO  80222
Phone: (303) 933-4529
Fax: (866) 230-8268
rcohen@cohenlawyers.com